**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 22-cr-164 (RBW)** |
| | : | |
| **v.** | : | |
| | : | |
| **BRIAN RICE,** | : | |
| **also known as "Ice,"** | : | |
| **ELLIOTT JOHNSON,** | : | |
| **also known as "Nadir" and "Hundo,"** | : | |
| **JEREMY YOUNG,** | : | |
| **also known as "G-Code,"** | : | |
| **DAEVON NARCE,** | : | |
| **also known as "Black Jesus,"** | : | |
| **WILLIAM PROCTOR,** | : | |
| **also known as "Billy,"** | : | |
| **ANDRE WILLIAMS,** | : | |
| **also known as "Sin,"** | : | |
| **AKO HANDY,** | : | |
| **also known as "K.O.,"** | : | |
| **KEITH GLISS,** | : | |
| **also known as "K.D." and "Flea,"** | : | |
| **MANUEL BROWN,** | : | |
| **also known as "Black,"** | : | |
| **WESLEY HILLIARD,** | : | |
| **also known as "God,"** | : | |
| **STANLEY HOOD,** | : | |
| **also known as "Slim,"** | : | |
| **THOMAS SHELTON,** | : | |
| **also known as "T,"** and | : | |
| **TYRONE WADE,** | : | |
| **also known as "Fats,"** | : | |
| | : | |
| **Defendants.** | : | |

<u>**GOVERNMENT'S MEMORANDUM FOR PRETRIAL DETENTION**</u>

***COMES NOW***, the United States of America, by and through its Attorney, the United

States Attorney for the District of Columbia, and respectfully moves this Court to order the pretrial

detention of the above-mentioned defendants, and in support thereof, submits this memorandum

1

which provides an overview of the long-term investigation, which led to the May 12, 2022, indictment of the above-named defendants for their involvement in a fentanyl and crack cocaine conspiracy.   As discussed below, this Court should order that the defendants be held without bond pending the pendency of this case.   In support thereof, we submit as follows:

## BACKGROUND

1.     The Bail Reform Act, Section 3142(e), which authorizes detention without bail pending trial, states:

> If, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required ***and the safety of any other person and the community***, such judicial officer ***shall order*** the detention of the person before trial.

Emphasis added.   Factors to be considered include

> (1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

> (2) the weight of the evidence against the person;

> (3) the history and characteristics of the person . . .

> (4) ***the nature and seriousness of the danger to any person or the community that would be posed by the person's release. . . .***

(Emphasis added).   Thus, at all times, the issue of defendants' danger to the community if released should be at the forefront of the Court's analysis when ruling on pre-trial detention.   In this case, because probable cause has been established that the defendants participated in a narcotics conspiracy, which involved large quantities of fentanyl and cocaine base, offenses for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances

Act, *see* 21 U.S.C. § 841(a)(1), the statutory presumption favoring detention applies and operates to compel the defendants pre-trial detention, unless and until the defendants present evidence to rebut it. *See* 18 U.S.C. § 3142(e) ("it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community"). Even when a defendant presents evidence to attempt rebuttal of the presumption, the presumption "remains a factor for consideration by the district court in determining whether to release or detain." The defendants cannot overcome this presumption.

## THE INVESTIGATION

2.      Beginning in July of 2021 and continuing through the present day, members of the VRU, in conjunction with the Federal Bureau of Investigation (FBI) and the Drug Enforcement Administration (DEA) have been conducting an investigation into the "7th and O Crew," historically known as "KDP" ("Kennedy Dog Pound"). The investigation has identified individuals associated with this organization as utilizing the streets encompassing the Shaw/Truxton neighborhood to sell narcotics, as well as buildings located in this area to store narcotics, narcotics paraphernalia, drug proceeds and firearms. The surrounding streets have been identified and are as follows: 1400 8th Street, NW, which includes the Giant grocery store parking lot, the 1200-1400 blocks of 7th Street, NW, the 600-800 blocks of O Street, NW, and the 1300 block of 9th Street, NW, which encompasses a Sunoco gas station and several other commercial businesses and residences. Based on the investigation, law enforcement has learned that members of this crew may refer to the area as the "O block," the "O" or "KDP." Law enforcement members have identified several commercial businesses, public recreation centers, and residences that are surrounded by prolific "open air" narcotic trafficking and violent crime, to include shootings and homicides. Based on the investigation to date, law enforcement also believes

that the identified crew members have been engaged in illegal narcotics distribution, including the distribution of crack cocaine and fentanyl.

3.      The investigation has revealed that crew members have played specific roles in illegal narcotics possession and distribution. For example, some members will receive money from a "buyer" and then direct them to another crew member (a "seller") who actually distributes the narcotics. During the course of the investigation, law enforcement has conducted numerous controlled narcotics purchases from the charged defendants and others, including purchases of fentanyl and cocaine base. A number of the charged defendants have been observed coordinating with co-defendants and other crew members to execute narcotics sales, including sharing drug sales conducted with customers and utilizing common stash houses for narcotics, firearms and proceeds.  Law enforcement has also observed several defendants and other crew members keeping narcotics on their person and using identified vehicles and residences. The crew is also believed to be engaged in illegal firearms possession, to include acts of violence with the use of these firearms, in part to facilitate the narcotics trafficking conspiracy. Law enforcement further believes that associated individuals may be involved in the illicit laundering of narcotics-related proceeds.

4.      For example,   on February 20, 2022, at approximately 2:57 a.m., MPD officers advised over the 3D radio zone that while in the 700 block of O Street, Northwest, multiple gun shots were heard. The officers stated that they heard approximately 20 to 30 gunshots.   MPD units responded to the scene and discovered multiple shell casings in the rear of 1330 7th Street, NW and secured the scene. MPD detectives responded to the scene to conduct an initial investigation. An MPD crime camera at 8th and O Streets, NW was stationed on the corner.  Footage from this camera revealed that at approximately 2:00 a.m., a white in color pickup truck parked in the 1300 block of 8th Street, Northwest.   At approximately 2:55 a.m., a dark colored SUV was observed

driving westbound on O Street, NW and proceeded to turn southbound in the 1300 block of 8th Street, NW and stopped. Eleven (11) individuals exited the vehicle. Among them were defendants Keith Gliss, Thomas Shelton, Daevon Narce, and other associates of the DTO. It was apparent that the vehicle was a rideshare (i.e. Uber or Lyft).



5.      The group of individuals who exited the rideshare vehicle walked southbound through the block, coming closer to the white pickup truck at which time there appears to be an interaction with the occupant(s) of the white truck and the group. The white truck began to reverse down the 1300 block of 8th Street, NW. An apparent muzzle flash is observed coming from the passenger side of the truck. As a result, the group began running in different directions. GLISS, SHELTON, and an associate were all observed pointing firearms in the direction of white truck. Muzzle flashes are observed from the guns of all three suspects.

*Shooting images*







6.     The occupant of the white truck reversed southbound on the block. GLISS, SHELTON, and another associate were observed running from the scene in an eastbound direction towards 7th Street.   The occupant of the white truck has not been identified and no victims of the shooting have made themselves known. There were multiple vehicles parked in the block that received damage from the gun fire. A review of the camera footage from 1330 7th Street, Northwest revealed that SHELTON was wearing a pink colored garment under a green jacket.



7.     While on scene, 3D detectives reviewed video footage from 1301 7th Street, NW which revealed a group of male and female subjects entering the building from the front door

moments after the gunshots. This group appeared to be the same group that was originally observed

exiting from the dark colored SUV, including GLISS, SHELTON, and another associate.[1]







---

[1] Based on surveillance operations, law enforcement data checks, and social media observations law enforcement knew the above depicted individuals to be GLISS and SHELTON.

8.     A further review of security footage showed GLISS, SHELTON and another associate taking the elevator to the third floor and entering an apartment. MPD officers made contact with the lease holder of the residence, who informed officers that the group of subjects entered her apartment and she made them leave. She agreed to sign a consent to search form to search the common area of her apartment for any firearms. Officers conducted a search and nothing was found. It was later determined that just prior to the arrival of law enforcement, GLISS and another member of the group were observed entering the elevator again. Further investigation revealed that the same aforementioned males entered a separate apartment at 1301 7th Street.[2] MPD officers responded to the 6th floor to investigate and several members of the DTO exited the apartment. GLISS was observed exiting the apartment, but he had changed his jacket and pants.

9.     On May 12, 2022, a Grand Jury sitting in the United States District Court for the District of Columbia returned a five count indictment in above-captioned matter charging Bryan Rice, Elliott Johnson, Jeremy Young, Daevon Narce, William Proctor, Andre Williams, Ako Handy, Keith Gliss, Manuel Brown, Wesley Hilliard, Stanley Hood, Thomas Shelton, and Tyrone Wade with Conspiracy to Distribute and Possess With Intent to Distribute 400 Grams or More of Fentanyl and 28 Grams or More of Cocaine Base, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(vi), (b)(1)(B)(iii), and 846, as well as Distribution of 40 Grams or More of Fentanyl (RICE, JOHNSON, and PROCTOR) and 28 Grams or More of Cocaine Base (HANDY), in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii) and (vi).  As discussed in more detail *infra,* based upon the aforementioned charges, Defendant Rice faces and mandatory minimum sentence of 10 years and a maximum term of life imprisonment, Defendants Elliott Johnson, Jeremy Young, Daevon Narce, William Proctor, Andre

_____

[2] Law enforcement learned that this apartment belonged to a former significant other of Narce.

Williams, Ako Handy, Keith Gliss and Wesley Hilliard each face a mandatory minimum term of five years of imprisonment and a maximum term of life imprisonment, and Defendants Manuel Brown, Tyrone Wade, and Thomas Shelton each face charges carrying a maximum term of 20 years of imprisonment.

## ARGUMENT

A.    Brian Rice, a.k.a., "Ice"

10.    Law enforcement confidential informants ("CIs") and undercover officers ("UCs") made undercover buys from Defendant Rice on October 20, 2021, February 3, 2022, February 16, 2022, March 4, 2022, and March 25, 2022. The amount of drugs sold by Defendant Rice in these sales totaled about 28.9 grams of crack cocaine (based partially on field tests and including some packaging) and 202.54 grams of fentanyl (based partially on field tests and including some packaging). Three of these buys from Defendant Rice each resulted in the recovery of an amount of fentanyl that triggers a five-year mandatory minimum, *see* 21 U.S.C. § 841(b)(1)(B)(vi). In particular, on February 16, 2022, he sold a UC about 57.7 grams of fentanyl. On March 4, 2022, he sold a UC about 56.9 grams (with packaging) of a substance that field-tested positive for fentanyl. On March 25, 2021, he sold a UC about 58.1 grams (with packaging) of a substance that field-tested positive for fentanyl.   Further, in connection with two of these sales—February 16, 2022, and March 4, 2022— Defendant Rice was seen exiting an apartment on the third floor of 1221 M Street, NW—a stash location—shortly before the sales occurred. Defendant Rice has otherwise been tied to that apartment, frequently appearing in surveillance entering and exiting that apartment and in videos and pictures believed to have been taken in that apartment.

11.     It appears that Defendant Rice has played a key role in the DTO by resupplying other crew members with narcotics. On November 23, 2021, Defendant Rice met Defendant Handy at a gas station before a planned sale with a UC. Defendant Handy retrieved something from Defendant Rice's vehicle, and then Defendant Handy was seen holding a small white substance wrapped in a clear plastic bag, which he stuffed in his underwear. He handed an object that appeared to be currency to Defendant Rice through the window. Defendant Narce got into the vehicle, emerged, and manipulated a small clear plastic bag containing a piece of white substance. There were phone calls between Defendant Rice and Defendant Handy before their meeting. On November 30, 2021, Defendant Young met and engaged in what appeared to be a hand-to-hand transaction with Defendant Rice outside of 1221 M Street, NW. Defendant Young was then seen with known DTO associate Kelfa Kamara before selling a UC 14.7 grams (with packaging) of a substance that field-tested positive for fentanyl. On March 3, 2022, Defendant Rice met with Defendant Narce, went into an apartment on the 9th floor of 1221 M Street, NW, reemerged, and handed Defendant Narce a clear plastic bag containing an unknown item that Defendant Narce put into his pants pocket. Defendant Narce then went to sell narcotics to a UC, and eventually, 27.46 grams of a substance containing fentanyl was recovered.

12.     Defendant Rice has also been in possession of firearms. On October 1, 2021, Wesley Hilliard posted a video to his Instagram account. In the video, which has been confirmed through information from a CI to be inside of the aforementioned third floor stash apartment at 1221 M Street, Defendant Hilliard, Defendant Rice, and Defendant Elliott Johnson can be seen inside the residence with large quantities of suspected narcotics and a firearm.   In the photos below, Defendant

Rice can be seen in possession of a firearm with a towel around his neck while he is in close proximity to suspected cocaine base on a paper towel on the floor.



During his February 16, 2022, sale to a UC Defendant Rice told someone on the phone that he has "a big ass 30 with a beam and scope on this motherfucker"—which is believed to be a reference to a firearm.

13.     On April 25, 2022, Defendant Rice was arrested for possession of a firearm. At the time of the offense, Rice was at the Rosebar Lounge, which is located at 1215 Connecticut Avenue, NW, Washington, D.C. MPD officers were summoned due to a commotion and saw that Defendant Rice had a handgun in his rear waistband:



During the ensuing struggle, the gun fell the floor. A woman picked it up, but an officer retrieved it from her. The firearm had on it a giggle switch, which is designed to convert it from a semi-automatic weapon to a fully automatic one. Defendant Rice was charged in D.C. Superior Court case 2022-CF2-002346 and has been held in that case since his arrest.

    *i.    The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug.*

    14.    The nature and circumstances of the offenses charged are extremely serious and involve the sale of large quantities of both fentanyl and crack cocaine, and therefore, weigh heavily in favor of detention. Drug overdose deaths in this country are at epidemic levels, with over 100,000 people dying from drug overdoses in 2021. *See NVSS, Vital Statistics Rapid Release, Provisional Drug Overdose Death Counts,* Centers for Disease Control and Prevention, National Center for Health Statistics (https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.). Of

those deaths, over 68,000 nationwide were linked to synthetic opioids like fentanyl, and 386 of those occurring in the District of Columbia. *Id.* Defendant Rice sold about 200 grams of fentanyl to a UC, and along with the reasonably foreseeable activities of his other co-conspirators, has been charged with being accountable for 400 grams or more of fentanyl.

ii.     *The weight of the evidence against the person.*

15.     The weight of the evidence against Defendant Rice also strongly favors detention. Defendant Rice conducted multiple recorded sales of narcotics to law enforcement sources.   His connection to a known stash location for narcotics was also documented by video evidence. This includes video evidence of him entering and exiting the location, including in connection with drug sales. Tolls records and social media also show his connections to other known members of the DTO.

16.     A search warrant executed following Defendant Rice's recent arrest at an apartment tied to him, and which was also occupied by another person, revealed a total of 82 rounds of ammunition and firearm parts and accessories, such as magazines and gun lights. Officers also found drug paraphernalia and a torn zip inside of the sink. The other occupant of the apartment (who was not Defendant Rice) was in possession of a small vial of a substance that field-tested positive for fentanyl.   This evidence further ties Defendant Rice to the conspiracy.

iii.    *Defendant Rice's history and characteristics.*

17.     Defendant Rice has an extensive criminal record. He was convicted of Attempted Robbery in both 2006 and 2014, in D.C. Superior Court. In the latter case, according to the Proffer of Facts prepared as part of his plea agreement, he snatched a woman's iPhone out of her pocket while she was waiting for a Metro train. *See* Proffer of Facts, 2014-CF3-008738, June 5, 2014. His

14

pending Superior Court matter is not the first time that Defendant Rice has been found to be in possession of a gun; he was convicted of Unlawful Possession of a Firearm (Prior Conviction) in D.C. Superior Court in 2011. Nor is it the first time he has been involved in drug offenses; he has a 2009 conviction for Attempted Distribution of Cocaine. On April 5, 2022—20 days before he was arrested in his pending D.C. Superior Court case—he was convicted of misdemeanor Possession of Cocaine and placed on probation. During the time period of the conspiracy set forth in the Indictment, he was on release after a conviction in Virginia of Grand Larceny and False Identity to Law Enforcement Officer.

18.     Even before the instant case, Defendant Rice has fared poorly on release. He failed to report to have a GPS monitor installed in connection with his ongoing supervision in the pending D.C. Superior Court case. His supervision following his 2006 conviction was revoked to incarceration in 2014. This record suggests that, if released, Defendant Rice will continue to commit crimes and fail to abide by conditions of release.

> iv.     *The nature and seriousness of the danger to any person or the community that would be posed by the person's release.*

19.     As discussed above, Defendant Rice distributed a significant amount of fentanyl and crack cocaine. These substances pose an extreme danger to the community. But the danger presented by Defendant Rice is higher still: he was caught with a machine gun on April 25, 2022, while the drug conspiracy was ongoing. His possession of this weapon suggests a willingness to use it to protect or further his drug trafficking business. Moreover, he relished in possessing guns; he proudly displayed a handgun in the aforementioned Instagram video, and he happily explained that he had a "big ass 30 with a beam and a scope." Should he be released, he would pose a profound risk to the public.

B.      Elliott Johnson, a.k.a., "Nadir" and "Hundo"

20.      During the course of the investigation, law enforcement has conducted four controlled narcotics purchases from Johnson for a total of approximately 94 grams of fentanyl and 4 grams of cocaine base.   Between February and March of 2022, Johnson sold narcotics to both confidential informants and undercover officers, including two separate sales totaling approximately one ounce and over two ounces of fentanyl respectively.   During the controlled narcotics purchase conducted on March 23, 2022, Johnson drove co-defendant Proctor to the location of the sale, and used Proctor to deliver approximately 64 grams of fentanyl to an undercover officer.   Johnson has also been observed in video surveillance frequenting a known stash location inside of the aforementioned third floor stash apartment in 1221 M Street.   As demonstrated by the still photo below, surveillance has confirmed Johnson entering and exiting this location immediately before and after conducting sales of narcotics over the course of the investigation.



21.      Furthermore, on October 1, 2021, co-defendant Wesley Hilliard posted a video to his Instagram account, "glockxdagod." In the video, which has been confirmed through information from a CI to be inside of the third floor stash apartment in 1221 M Street, co-defendants Hilliard, Rice

and Elliott Johnson can be seen inside the residence with large quantities of suspected narcotics and a firearm.   As discussed in paragraph 12 *supra,* Rice can be seen in possession of firearm with a towel around his neck while he is in close proximity to suspected cocaine base on a paper towel on the floor. Also in the video (still shot below), Elliott Johnson can be seen dancing while holding two plates containing a white powdery substance.   Also during the video, Hilliard is seen holding a firearm.



On May 25, 2022, Defendant Johnson was arrested on the instant indictment. Police recovered from his residence additional quantities of fentanyl and a firearm equipped with a switch to allow the firearm to operate as a fully automatic pistol.

17

22.     Johnson has a significant criminal history, including convictions for PWID Phencyclidine (PCP) in 2020, Distribution of Cocaine in 2020, Possession of Cocaine in 2016, Second-Degree Assault in 2016 and Robbery in 1999.

              *i.*     *The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug.*

23.     The nature and circumstances of the offenses charged are extremely serious and involve the sale of large quantities of both fentanyl and crack cocaine, and therefore, weigh heavily in favor of detention. As discussed *supra,* drug overdose deaths are at all-time highs in this country and fentanyl and other opioid are the primary drivers of this epidemic. As part of his participation in the charge conspiracy, Defendant E. Johnson was selling significant quantities of one of the deadliest controlled substances in existence.   Accordingly, his conduct is properly characterized as extremely dangerous indicating that he represents a serious threat to the safety of the community.

24.     As discussed *supra,* the investigation also revealed that the defendant was present on occasions when he and his co-conspirators had access to firearms and narcotics, indicating this drug trafficking organization's willingness and capability of using violence to facilitate and protect its illicit business.   In addition, at the time of his arrest additional quantities of fentanyl were recovered from his residence along with a firearm affixed with a switch to enable it to operate as a fully automatic weapon.

              *ii.*     *The weight of the evidence against the person*

25.     The weight of the evidence against Defendant Johnson also strongly favors detention.   Defendant Johnson conducted multiple sales narcotics to informants and undercover officers, and those meetings were recorded using audio and video devices.   Defendant Johnson's

connection to a known stash location for narcotics was also documented by video evidence. The evidence establishing Defendant Johnson's participation in the overall conspiracy is also strong, and includes video evidence of him driving co-defendant William Proctor to meet with an undercover officer to conduct a controlled sale of fentanyl that was arranged by Johnson, and selling narcotics out of a common stash location used by co-conspirators Proctor, Tyrone Wade, Wesley Hilliard, and Bryan Rice.   In addition, telephone toll records for Johnson's cellular telephone show multiple contacts with other co-conspirators during the course of the conspiracy, including 10 of the 12 other charged co-defendants in the indictment.

26.     The seizure of additional fentanyl and a firearm from the defendant at the time of his arrest only further enhances the strength of the evidence of his involvement in this drug trafficking organization.

### iii.     Defendant Johnson's history and characteristics.

27.     As discussed *supra,* Johnson has multiple convictions dating back to 1997 for both violent and felony drug offenses, including a robbery conviction from 1999, a second degree assault conviction from 2016, and two felony narcotics trafficking convictions from 2020. In light of the defendant's repeated involvement in criminal activities, particularly in selling narcotics, the government submits that his history and characteristics establish that he represents a danger to the community and is unlikely to comply with any conditions of release.

### iv.     The nature and seriousness of the danger to any person or the community that would be posed by the person's release.

28.     Defendant's Johnson's participation in a long-term and large scale conspiracy to sell fentanyl and crack cocaine in the District of Columbia demonstrates that he represents a significant danger to the community.   As discussed *supra,* fentanyl is one of the deadliest

controlled substances presently available and the significant quantities the defendant was involved in selling suggest has access to multiple suppliers and that he is an experienced drug trafficker. Further, some of the members of the 7th and O DTO are known to carry firearms, and have participated in, or been victims of, shooting incidents.   As discussed *supra,* based upon an Instagram post, Defendant Johnson was present in a stash apartment at the same time co-defendants Hilliard and Rice were in possession of firearms.   Further, on May 25, 2022 police recovered from Johnson's residence a firearm equipped with a switch to allow the gun to be fired as a machine gun and additional quantities of fentanyl were seized.

29.     Accordingly, based upon the overwhelming evidence establishing Defendant Johnson's extensive involvement in this drug conspiracy, the government submits that the defendant cannot rebut the presumption of dangerousness, and therefore, he should be detained pending trial in this matter.

C.     Jeremy Young, a.k.a., "G Code"

30.     In nine controlled buys between October 13, 2021, and January 12, 2022, Defendant Young sold to law enforcement sources a total of about 3.6 grams of crack cocaine (based on field tests and including some packaging) and about 58 grams of fentanyl (based partially on field tests and including some packaging). In each of three of these buys, he sold roughly 15 grams, including packaging. Defendant Young engaged in one controlled buy in conjunction with another member of the DTO: on October 20, 2021, a CI called Defendant Young to buy narcotics. Defendant Young stated he was busy. Defendant Rice then came downstairs from 1221 M Street, NW, confirmed the CI knew "G Code," and sold the CI 0.94 grams of fentanyl and 0.5 grams of crack cocaine (including packaging and based on field testing). Additionally, as discussed above,

on November 30, 2021, Defendant Young engaged in a hand-to-hand transaction with Defendant Rice, was in a car with Defendant Kamara, and sold a UC 14.7 grams of fentanyl (including packaging and based on field testing).

31.     Defendant Young has been captured in surveillance in the area of 7th and O Streets, NW. For example, on September 15, 2021, Young was filmed on a bicycle engaging in what appeared to be a drug transaction. Specifically, the buyer handed him cash and, in exchange, Young manipulated something in a black bag and handed small objects to the buyer. During surveillance in that location and on social media, Defendant Young has been seen with other members of the DTO. He has also been seen in and around stash locations.

32.     On May 25, 2022, law enforcement searched an apartment tied to Defendant Young (which his girlfriend also occupies). In a toilet, law enforcement found about 100 grams of pills. In a bedroom, they found two bags of various pills and a bag containing approximately 17 grams of fentanyl (according to a field test).

     *i.*     *The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug.*

33.     The nature and circumstances of the offenses charged are extremely serious and involve the sale of a large quantity of fentanyl—a potentially lethal drug. Indeed, based solely on his own controlled buys, Defendant Young is facing a five-year mandatory minimum. But he has, of course, sold more than what was obtained during controlled buys; surveillance also shows him selling in the area of 7th and O:



The nature and circumstances of his crimes weigh in favor of detention.

> *ii.   The weight of the evidence against the person.*

34.     The weight of the evidence against Defendant Young also favors detention. Defendant Young was involved in many recorded controlled buys with law enforcement sources. His association with other DTO members is documented by photos on social media, which show Young with other members of the DTO. It is corroborated by telephone records, which show communications with other members of the DTO. It is corroborated by surveillance, which shows him with other members of the DTO. For two controlled buys in which he was involved, he appears to have worked or had contact with Rice.

35.     Additionally, his drug dealing is also amply corroborated by the search of an apartment linked to him. Law enforcement found about a half ounce of fentanyl and numerous pills, which only underscores the amount of distribution in which he is engaged.

          *iii.*     *Defendant Young's history and characteristics.*

36.     Defendant Young has six prior convictions stretching back to 2005. All of them involve narcotics, and five of them involve Attempted Distribution, Attempted Possession with Intent to Distribute, or Possession with Intent to Distribute. Several of the resulting periods of supervision ended satisfactorily—and yet it is clear that Defendant Young continues to engage in criminal activity. Despite being caught, prosecuted, placed on supervision (in which he presumably received at least some services) time after time, he has again been charged with narcotics offenses. His multiple convictions have not dissuaded him from dealing controlled substances. His continued criminal behavior weighs in favor of detention.

          *iv.*     *The nature and seriousness of the danger to any person or the community that would be posed by the person's release.*

37.     Defendant Young would pose a serious danger to the community if released. During the course of the conspiracy, he has distributed a significant amount of fentanyl. Given the prolific nature of his drug dealing during the course of this conspiracy, as well as the nearly two decades during which he has committed drug offenses, he would likely return yet again to selling drugs if released. He should therefore remain detained pending trial.

    D.     <u>Daevon Narce, a.k.a., "Black Jesus"</u>

38.     Between November of 2021 and March of 2022, law enforcement conducted seven controlled narcotics purchases of fentanyl totaling approximately 65 grams.   Furthermore, during two of those controlled purchases, Narce sold an undercover officer approximately one ounce of fentanyl on each occasion.   The investigation has established Narce's participation in the 7th and O crew, his involvement in operating an open air drug market in the areas surrounding 7th and O Streets, NW, and his connection to violent activities.   Narce has consistently been surveilled in

the area of 7th and O Streets with other members of this DTO, including other co-defendants. Narce has also been surveilled during the investigation being resupplied with narcotics by co-defendant Brian Rice, and on at least one occasion while Rice also resupplied co-defendant Ako Handy. Narce has also been observed entering suspected stash locations located at 1330 7th Street, NW in which other members of the DTO have been seen entering and exiting, including Gliss, Stanley Hood, and Andre Williams.

39.     Narce has also been associated with violent activities related to this DTO.   On December 6, 2021, the Third District received a radio run for a report of a shooting at 7th and P Streets, Northwest, Washington, D.C.   MPD officers arrived on scene and observed Narce in the area suffering from a gunshot wound. MPD officers conducted an investigation.   Narce was transported to Howard Hospital by means of EMS accompanied by an MPD officer.

40.     During the shooting investigation, Narce identified himself as "David Anderson" and was in possession of a D.C. state-issued ID card displaying the name "David Anderson." Third District officers continued to investigate the offense and later determined Narce's true identity. Third District officers by means of law enforcement databases printed out photograph of Narce, and, due to distinct tattoos on his neck, were able to make a positive identification. When confronted about the false information he provided, Narce by his own admission stated that he had an open warrant out of Virginia. A check of a law enforcement database revealed Narce had two outstanding warrants from Virginia. Narce was placed under arrest for Fugitive from Justice for the Fairfax County warrant and remained at Howard Hospital to receive medical treatment for the gun shot injuries, which occurred on 7th and P Street, NW, Washington DC.

41.     Subsequent to Narce's arrest on the Virginia warrant, officers searched Narce and recovered from his person $2,231 in U.S. currency and a digital scale with white powder residue located on it. A field test on the white powder residue resulted in a positive color reaction for fentanyl.

42.     As discussed in paragraphs 4-8 *supra,* on February 20, 2022, Narce was also present during a shooting incident near 7th and O Streets, NW, when he, Gliss and Shelton were shot at by unidentified individuals in a white SUV.   During the course of that incident, Gliss and Shelton were observed brandishing firearms.   These incidents demonstrate Narce's connection to violence associated with this DTO and evidence that members of the DTO possess firearms to protect themselves and facilitate their illegal activities.

43.     On May 25, 2022, Narce was arrested on the indictment in this matter inside an apartment located at 1500 Massachusetts Avenue, NW.   During the execution of the arrest warrant, a firearm was tossed out the window and an additional firearm was recovered from the bedroom from where Narce was observed exiting.   Narce is also currently on probation for a domestic assault conviction and simple assault conviction from 2021.   Narce's prior convictions also include Escape convictions from 2019 and 2014, Destruction of Property, Fleeing Law Enforcement and UUV from 2015, PWID Marijuana from 2014, and multiple juvenile adjudications.[3]

        i.     *The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug.*

44.     The nature and circumstances of the offenses charged are extremely serious and

---

[3] The government will address the specifics of Defendant Narce's juvenile record during the detention hearing.

involve the sale of large quantities of fentanyl, and therefore, weigh heavily in favor of detention. As discussed *supra,* drug overdose deaths are at all-time highs in this country and fentanyl and other opioids are the primary drivers of this epidemic.   As part of his participation in the charge conspiracy, Defendant Narce was selling significant quantities of one of the deadliest controlled substances in existence.   Accordingly, his conduct is properly characterized as extremely dangerous indicating that he represents a serious threat to the safety of the community.

45.     In participating in the operation of an open air drug market in the area of 7th and O Streets, NW, the defendant's conduct and that of his co-conspirators has created an environment that has incited violence, including multiple shooting incidents, as discussed *supra.*   The occurrence of such incidents would no doubt be much less frequent if the defendant and his co-conspirators were not engaged in illicit drug trafficking throughout this neighborhood.   Indeed, Defendant Narce was the victim of a shooting late last year in the very same area in which he sells drugs.

     ii.     *The weight of the evidence against the person*

46.     The weight of the evidence against Defendant Narce also strongly favors detention. Defendant Narce conducted multiple sales of narcotics to informants and undercover officers, and those meetings were recorded using audio and video devices.   The evidence establishing Defendant Narce's participation in the overall conspiracy is also strong, and includes surveillance videos of him getting resupplied narcotics along with co-defendant Handy by co-defendant Brian Rice.   Furthermore, there is video surveillance of Narce with other co-defendants at 7th and O Streets while narcotics transactions were being conducted.   Video surveillance footage further establishes Narce entering and exiting common suspected stash locations used by other co-

defendants.   In addition, telephone toll records for Narce's cellular telephone show multiple contacts with other co-conspirators during the course of the conspiracy, including at least 9 of the 12 other charged co-defendants in the indictment.

iii.      *Defendant Narce's history and characteristics.*

47.      As discussed *supra,* the Defendant has significant criminal history consisting of 7 adult convictions and 34 arrests.   Further, the Defendant Narce was on probation at the time of this instant offense, and the pretrial services report states that the defendant's compliance was "marginal," and that he is "difficult to supervise and has outstanding obligations."   Defendant's Probation Officer recommends that he be held without bond.   The defendant has also previously had his probation revoked for non-compliance with supervision for his conviction in 2015.   The defendant's criminal history also includes convictions for crimes of violence, including two assaults for which he is currently on probation and juvenile adjudications which will be addressed in detail at the detention hearing.   The defendant's criminal history also includes convictions that establish him as a high risk to abscond, including two convictions for Prisoner Escape and Fleeing a Law Enforcement Officer.

48.      In light of the defendant's repeated involvement in criminal activities, including violent offenses, the government submits that his history and characteristics establish that he represents a danger to the community, a risk of flight, and is unlikely to comply with any conditions of release.

iv.      *The nature and seriousness of the danger to any person or the community that would be posed by the person's release.*

49.      Defendant's Narce's participation in a long-term and large scale conspiracy to sell fentanyl in the District of Columbia demonstrates that he represents a significant danger to the

27

community.   As discussed *supra,* fentanyl is one of the deadliest controlled substances presently available and the significant quantities the defendant was involved in selling suggest has access to significant supplies of narcotics and that he is an experienced drug trafficker.   Further, some of the members of the 7th and O DTO are known to carry firearms, and have participated in, or been victims of, shooting incidents, including Defendant Narce.   As discussed *supra,* on May 25, 2022, police recovered two firearms from the apartment the defendant was found in at the time of his arrest.

50.     Accordingly, based upon the overwhelming evidence establishing Defendant Narce's extensive involvement in this drug conspiracy, the government submits that the defendant cannot rebut the presumption of dangerousness, and therefore, he should be detained pending trial in this matter.

E.     William Proctor, a.k.a., "Billy"

51.     From three controlled buys with Proctor on January 20, 2022, January 24, 2022, and March 23, 2022, law enforcement recovered about 1.1 grams of cocaine base (including packaging and based on a field test) and about 65.6 grams of fentanyl (including packaging and based on field tests). In the first two buys, a CI contacted Wesley Hilliard and asked to purchase drugs. Defendant Proctor ended up serving the CI. In the third buy, a UC tried to buy fentanyl from Defendant E. Johnson. Defendant Elliott Johnson drove his vehicle to the meeting location, but Defendant Proctor met with the UC and completed the sale of 64.6 grams of fentanyl (with packaging and based on a field test). Right after the sale, Defendant E. Johnson explained to the UC that Defendant Proctor is his uncle, and he trusts him.

52.     Defendant Proctor is the leaseholder of the previously discussed third floor stash

apartment at 1221 M Street, NW. This location has been key to the DTO's activities. Surveillance showed DTO members frequenting that location and selling drugs from the apartment and in the hallway just outside of the apartment.  The Instagram video mentioned above—in which Rice, Hilliard, and E. Johnson can be seen with large amounts of narcotics and a gun—is believed to have been taken in that apartment. Other media from that location shows various DTO members at different times. For example, one defendant posted a picture of himself in that apartment and labeled it "The Trap"—which is believed to be an acknowledgement that the apartment has been used as a place where drugs are stored.

53.     On May 25, 2022, law enforcement searched that apartment pursuant to a judicially authorized search warrant. In the bathroom, they found a person flushing a substance later determined to be Xylazine, a cutting agent that is also used in sedation for animals. The packing (and some toilet water) and substance weighed about 39.2 grams. They found another person in the apartment near a jacket that contained that person's ID and about 19.3 grams of crack cocaine (including packaging and based on a field test).

> i.     *The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug.*

54.     The nature and circumstances of the offenses are extremely serious. At best, Proctor allowed weapons and drugs to be bought into his apartment. He allowed others to use his apartment as a place from which they distributed dangerous drugs to members of the community. But Proctor also engaged in sales himself, including one sale of fentanyl that carries a mandatory minimum five-year sentence. He played a key role in the DTO. Under these circumstances, he should remain held.

> ii.    *The weight of the evidence against the person.*

55.     There is ample evidence against Proctor. He engaged in recorded controlled buys with law enforcement sources. One of those buys involved a significant amount of drugs, and all of them involved associations with other DTO members. Numerous other pieces of evidence tie Proctor to the DTO. For example, between May 1, 2021, and January 31, 2022, he had calls with Defendants Hood and Narce, and 498 calls with Defendant Rice. The sheer volume of DTO activity in Proctor's apartment is also significant evidence showing Proctor's involvement in the conspiracy. A surveillance camera outside of Proctor's apartment has captured much of the comings and goings of DTO members. It has also captured numerous apparent drug sales by members of the DTO.

               iii.     *Defendant Proctor's history and characteristics.*

56.     Defendant Proctor's record stretches back to 1986, when he was convicted of misdemeanor Unlawful Entry in Virginia. Since then, he has been convicted twice of Destruction of Property, and twice of Attempted Unauthorized Use of a Vehicle. He has been convicted three times for Distribution of a Controlled Substance (PCP or cocaine), once for misdemeanor Possession of Heroin, and once for Attempted Distribution of Heroin.

57.     Moreover, on April 23, 2022, he was charged with First-Degree Burglary in D.C. Superior Court. According to the *Gerstein* affidavit filed in that case, he and another person allegedly stole a scooter from an apartment in Defendant Proctor's building while that apartment was occupied. *See Gerstein* Affidavit, 2022-CF3-002264, April 23, 2022. He was released pending trial but failed to report by telephone as required. His lengthy criminal history, especially involving drugs, and his apparent failure to abide by his release conditions in his pending burglary case suggest he would fare poorly if released.   Thus, he should remain held.

>     *iv.    The nature and seriousness of the danger to any person or the community that would be posed by the person's release.*

58.    Defendant Proctor would pose a danger if released. He played a key role in the activities of a drug trafficking organization that sold a significant amount of fentanyl and crack cocaine. Should he choose to continue those activities upon his release, he would further jeopardize the safety and well-being of members of the community. His lengthy criminal history and his failure to comply with his conditions of release in his pending burglary case underscore that danger.

F.    <u>Andre Williams, a.k.a., "Sin"</u>

59.    In nine controlled buys from Defendant Williams between September 2, 2021 and December 2, 2021, law enforcement obtained about 8.34 grams of crack cocaine (including packaging and based on a field tests) and 33 grams of fentanyl (including packaging and based on field tests). However, the amount of narcotics attributable to him is more than just what he sold. He has been seen on surveillance distributing and possessing with intent to distribute narcotics in the area of 7th and O Streets, NW.

60.    Additionally, during the course of one buy, he told a UC that he could get a half a kilogram of narcotics. Defendant Williams was also frequently seen entering and exiting an apartment that was a suspected stash location (although no contraband was seized during a search on May 25, 2022).

61.    Defendant Williams has also been found in possession of a firearm during the time period of this investigation. On March 30, 2022, officers made contact with a vehicle that was illegally parked. Defendant Williams was a passenger in the vehicle. During the stop, officers saw alcohol in the car and stepped Williams out. Officers eventually found a handgun in his waistband:



That handgun was a ghost gun with 10 rounds in a 15-round magazine. Defendant Williams was charged in D.C. Superior Court case 2022-CF2-001796 but was not held.

       i.     *The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug.*

62.      The nature and circumstances of the offenses are extremely serious. Williams sold a significant amount of narcotics and, based on his statement to the UC about being able to obtain half a kilogram of narcotics, was poised to sell more. The sale of these drugs poses a significant danger to users and weighs in favor of detention.

       ii.     *The weight of the evidence against the person.*

63.      The weight of the evidence against Defendant Williams weighs in favor of detention. There are multiple recorded controlled buys by Defendant Williams that clearly show his guilt. Williams appears in surveillance in connection with suspected drug activity at 7th and O Streets, NW, often with other crew members around. For example, on September 2, 2021, he stood

in the 700 block of O Street, NW, while twisting a clear plastic bag with a white substance inside of it. He is also talking to an unindicted DTO member, and Defendant Shelton is also nearby. A minute later, Williams hands drugs to a buyer. On September 7, 2021, he was engaged in what appeared to be two drug sales. On October 5, 2021, he twice sold what appeared to be marijuana to someone, and engaged in a third sale of an unknown substance.

64.     Significant evidence ties Williams to other DTO members. Prior to controlled buys, he often left the apartment mentioned above. Williams is also in pictures on social media with Defendants Young and Gliss. Furthermore, toll records for Williams's phone showed numerous calls with multiple co-conspirators, including with 9 out of the 12 indicted defendants.

> iii.     *Defendant Williams's history and characteristics.*

65.     Since 2009, the Defendant has been convicted six times. Notably, he was convicted in 2011 in Maryland for Second-Degree Assault. He was convicted in 2018 in D.C. for felony Receiving Stolen Property; according to the Proffer of Facts filed in support of the plea, he was found in possession of a stolen scooter, *see* Proffer of Facts, 2015-CF2-006077, January 4, 2016. His most recent conviction was in 2018 of misdemeanor Possession of Controlled Substances (cocaine and heroin) and Attempted Possession of Drug Paraphernalia with Intent to Deliver and Sell. His probation in this latter matter was revoked. In addition, the defendant is presently on pretrial release for Unlawful Possession of a Firearm (Prior Conviction).   He also has four prior bench warrants from previous cases for failing to appear.   This extensive criminal history and recent failure on supervision weighs in favor of detention.

> iv.     *The nature and seriousness of the danger to any person or the community*
> *that would be posed by the person's release.*

66.     Defendant Williams would pose an extreme danger if released. Like others in this case, he is responsible for distributing a large amount of fentanyl to law enforcement sources—and, undoubtedly, many others. He also apparently has access to larger quantities of narcotics, and releasing him would raise the possibility that he engages in still more drug sales. Further, his recent possession of a firearm suggests he would use a firearm to protect or further his drug trafficking activity.

G.      Stanley Hood, a.k.a., "Slim"

67.     In four controlled buys with a UC or CI on November 28, 2021, January 18, 2022, January 26, 2022, and February 7, 2022, Defendant Hood sold to law enforcement about 3.39 grams of crack cocaine (including packaging and based on field tests) and 0.6 grams of fentanyl (including packaging and based on a field test). He conducted the last sale with an unindicted member of the DTO.

68.     Hood has been observed on surveillance in the area of 7th and O Streets with other DTO members, including Defendants Shelton, Handy, Williams, and Gliss. He has been observed around DTO members when they have possessed drugs or near the time they have engaged in sales. For example, on January 6, 2022, a CI placed a call to Defendant Gliss to buy drugs. Defendant Gliss was at that time with various DTO members at 7th and O Streets. Afterwards, officers observed Defendants Gliss and Hood and an unindicated DTO member walking eastbound on the 600 block of O Street, NW. They went into an apartment building and then walked back to 7th and O Streets. The CI soon thereafter purchased 0.7 grams of crack cocaine (including packaging and based on a field test) from both Gliss and the unindicted member, who were standing next to each other.

34

69.    On May 25, 2022, an apartment at which Defendant Hood lives at with his girlfriend was searched pursuant to a warrant. Officers recovered a bag with about a half pound of what appears to be marijuana, a zip with about one gram of white powder, and a bottle of codeine.

      *i.     The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug.*

70.    The nature and circumstances of the offenses are extremely serious. Defendant Hood worked with a large group of people to distribute fentanyl and crack cocaine to vulnerable members of the community. This weighs in favor of detention.

      *ii.    The weight of the evidence against the person.*

71.    The weight of the evidence against Defendant Hood weighs in favor of detention. There is recorded evidence of him selling to law enforcement sources and of him being in the area of 7th and O Streets, NW. There are also Instagram conversations between Hood and an unindicted co-conspirator, in which he appears to discuss drug distribution, possibly involving methamphetamine. Toll analysis shows that Hood has had contact with members of the DTO. For example, between August 10, 2021, and March 11, 2022, he had about 193 calls with Defendant Williams and 112 calls with Defendant Handy.

      *iii.   Defendant Hood's history and characteristics.*

72.    The Defendant has no prior convictions.

      *iv.   The nature and seriousness of the danger to any person or the community that would be posed by the person's release.*

Defendant Hood should remain detained. Like others in this case, he is responsible for distributing fentanyl and crack cocaine to law enforcement sources—and, undoubtedly, many

others. Further, photos from his iCloud account suggest that he has been in possession of firearms, or around or associated with those who have been. This image is dated March 27, 2022:



This image is dated October 20, 2020:



73.     In light of his involvement in the conspiracy and his apparent connection to firearms, he would pose a danger if released.

H.     Ako Handy, a.k.a., "K.O."

74.     Between September of 2021 and January of 2022, law enforcement conducted eight

36

controlled narcotics purchases from Handy totaling approximately 76 grams of cocaine base and one gram of fentanyl.   During several of these transactions, Handy sold half-ounce to one ounce quantities of crack to an undercover officer, which indicates Handy's access to substantial quantities of this dangerous controlled substance.   The investigation has established Handy's participation in the 7th and O crew and his involvement in operating an open air drug market in the areas surrounding 7th and O Streets, NW.   Physical surveillance conducted during the course of this investigation established that Handy is present in the vicinity of 7th and O Streets on a near daily basis selling narcotics with other members of this DTO, including other co-defendants. Handy was also surveilled during the investigation being resupplied with narcotics by co-defendant Brian Rice while Rice also resupplied co-defendant Daevon Narce.   Handy was also surveilled in September of 2021 distributing suspected narcotics to an unidentified male (UM) and handing to co-defendant Manuel Brown the U.S. currency provided by the UM to Handy for the drugs.   Handy has also been observed entering an apartment building located at 1301 7th Street, NW in which suspected drug stash apartments were located, and which is the same building other members of the DTO have been observed entering, including co-defendants Rice and Narce.

75.   At the time of Handy's arrest on May 25, 2022, law enforcement recovered approximately 12 grams of fentanyl and 4.8 grams of cocaine base from his person.   Furthermore, a search warrant executed at his known residence resulted in the recovery of suspected cocaine totaling approximately one ounce.   Handy has a pending criminal matter in D.C. Superior Court case number 2019-CF2-014834, in which he is charged with PWID While Armed Heroin and Cocaine, PFCOV, Unlawful Possession of a Firearm, Possession of a Large Capacity Magazine, Possession of an Unregistered Firearm, Unlawful Possession of Ammunition, and Possession of

Drug Paraphernalia.   The underlying facts of the aforementioned Superior Court matter reveal that the narcotics and firearm were recovered during the execution of a search warrant on November 20, 2019 at the same residence where police recovered the cocaine on May 25, 2022. Handy's criminal history also includes convictions for Distribution of a Controlled Dangerous Substance in 2004, Possession of an Unregistered Firearm in 1994, Possession of Ammunition in 1993, and Lewd Indecent Act or Proposal in 1993.

> i.    *The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug.*

76.    The nature and circumstances of the offenses charged are extremely serious and involve the sale of large quantities of crack cocaine and fentanyl, and therefore, weigh heavily in favor of detention.   As discussed *supra,* drug overdose deaths are at all-time highs in this country and fentanyl and other opioids are the primary drivers of this epidemic.   As part of his participation in the charged conspiracy, Defendant Handy was selling significant quantities of crack cocaine and fentanyl.    Indeed, at the time of his arrest, Handy was found in possession of approximately 12 grams of suspected fentanyl.    Accordingly, his conduct is properly characterized as extremely dangerous indicating that he represents a serious threat to the safety of the community.

77.    Similarly, in participating in the operation of an open air drug market in the area of 7th and O Streets, NW, the defendant's conduct and that of his co-conspirators has created an environment that has incited violence, including multiple shooting incidents, as discussed *supra.* The occurrence of such incidents would no doubt be much less frequent if the defendant and his co-conspirators were not engaged in illicit drug trafficking throughout this neighborhood. Consistent with this concern, the defendant already has a pending charge in Superior Court in

which he is charged with possessing a firearm in connection with a drug trafficking offense.

        *ii.*     *The weight of the evidence against the person.*

78.     The weight of the evidence against Defendant Handy also strongly favors detention. Defendant Handy conducted multiple sales of narcotics to informants and undercover officers, and those meetings were recorded using audio and video devices. The evidence establishing Defendant Handy's participation in the overall conspiracy is also strong, and includes surveillance videos of him getting resupplied narcotics along with co-defendant Narce by co-defendant Brian Rice. Furthermore, there is video surveillance of Handy with other co-defendants at 7th and O Streets while narcotics transactions were being conducted. Video surveillance footage further establishes Handy entering and exiting common suspected stash locations used by other co-defendants. In addition, telephone toll records for Handy's cellular telephone show multiple contacts with other co-conspirators during the course of the conspiracy, including with at least 5 of the 12 other charged co-defendants in the indictment, as well as multiple other unindicted co-conspirators.

        *iii.*     *Defendant Handy's history and characteristics.*

79.     In addition to the defendant's pending Superior Court matter referenced *supra,* the defendant has nine prior convictions and 43 arrests. As stated above, Defendant Handy's convictions include drug trafficking, drug possession, firearms and violent (simple assault) offenses. The defendant's criminal history establishes a consistent pattern of criminal behavior, notwithstanding that he has received multiple opportunities to reform his behavior with sentences of probation. In addition, according to the PSA report, the defendant appears to be in non-compliance with his conditions of release in his pending Superior Court matter, including multiple

failures to report by telephone.   The defendant's criminal history also reflects the issuance of at least four bench warrants for failing to appear.   As such, there is significant evidence that the defendant presents a risk of flight.

80.     In light of the defendant's repeated involvement in criminal activities, including prior drug trafficking and firearms related offenses, the government submits that his history and characteristics establish that he represents a danger to the community, a risk of flight, and is unlikely to comply with any conditions of release.

> iv.     *The nature and seriousness of the danger to any person or the community that would be posed by the person's release.*

81.     Defendant Handy's participation in a long-term and large scale conspiracy to sell crack and fentanyl in the District of Columbia demonstrates that he represents a significant danger to the community.   As discussed *supra,* crack cocaine and fentanyl are extremely addictive and dangerous controlled substances and the significant quantities the defendant was involved in selling suggest has access to significant supplies of narcotics and that he is an experienced drug trafficker.   Further, the defendant has a history of possessing firearms, has a pending criminal case for possessing a firearm in connection with drug trafficking, the evidence has established other members of the 7th and O DTO are known to carry firearms and have participated in, or been victims of, shooting incidents.   As discussed *supra,* on May 25, 2022, police recovered additional quantities of crack, fentanyl and cocaine from the defendant and inside his residence at the time of his arrest.

82.     Accordingly, based upon the overwhelming evidence establishing Defendant Handy's extensive involvement in this drug conspiracy, the government submits that the defendant cannot rebut the presumption of dangerousness, and therefore, he should be detained pending trial

in this matter.

I.   <u>Keith Gliss, a.k.a., "K.D." and "Flea"</u>

83.   Between September of 2021 and February of 2022, law enforcement conducted eight controlled narcotics purchases from Defendant Gliss totaling approximately 13 grams of cocaine base.   Furthermore, during several of these transactions, as well as surveillance at other times during the investigation, Gliss was video recorded in possession of larger quantities of suspected cocaine base. During at least two of these transactions, Gliss coordinated sales of drugs to an informant with two different unindicted co-conspirators and known members of the 7th and O DTO.   The investigation has established Gliss's participation in the 7th and O crew and his involvement in operating an open air drug market in the areas surrounding 7th and O Streets, NW. Physical surveillance conducted during the course of this investigation established that Gliss was present in the vicinity of 7th and O Streets on a near daily basis selling narcotics with other members of this DTO, including other co-defendants.   Gliss has been surveilled entering and exiting a suspected stash location used by other 7th and O Crew members located at an apartment inside of 1330 7th Street, NW, including co-defendants Narce, Hood and Williams.   Other crew members have been observed entering various apartments at 1330 7th Street, including co-defendants Jeremy Young, Elliott Johnson and Manuel Brown.

84.   As discussed in paragraphs 4-8 *supra,* Gliss was involved in a shooting incident on February 20, 2022 during which CCTV footage captured him brandishing a firearm.   At the time of this incident, Gliss was with several other DTO members, including co-defendants Shelton and Narce.   On May 25, 2022, during the execution of a search warrant at Gliss's residence, police recovered the following items: (1) a firearm with a high capacity magazine recovered from the

kitchen; (2) approximately 105 grams of suspected crack in the bathroom toilet; and (3) approximately 21 grams of suspected crack and 9 grams of suspected fentanyl recovered from the bedroom.

85.     Defendant Gliss also has three prior convictions for Attempted Distribution of Marijuana from 2017, PWID Marijuana and Possession of Oxycodone from 2016, and Attempted Possession of Cocaine from 2006.   In addition, the defendant appears to have had two prior bench warrants issued against him for failing to appear in 2016 and 2006.

           i.     *The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug.*

86.     The nature and circumstances of the offenses charged are extremely serious and involve the sale of large quantities of crack cocaine, and therefore, weigh heavily in favor of detention.   As discussed *supra,* drug overdose deaths are at all-time highs in this country and fentanyl and other opioids are the primary drivers of this epidemic.   As part of his participation in the charged conspiracy, Defendant Gliss was selling significant quantities of crack cocaine (and apparently fentanyl).   Indeed, at the time of his arrest, recovered from Gliss's residence was a firearm and high capacity magazine, over 120 grams of suspected crack cocaine, and 9 grams of fentanyl.   Accordingly, his conduct is properly characterized as extremely dangerous indicating that he represents a serious threat to the safety of the community.

87.     Similarly, in participating in the operation of an open air drug market in the area of 7th and O Streets, NW, Defendant Gliss's conduct and that of his co-conspirators has created an environment that has incited violence, including the shooting on February 20, 2022 during which Gliss brandished a firearm, as discussed *supra.*   The occurrence of such incidents would no doubt

be much less frequent if the defendant and his co-conspirators were not engaged in illicit drug trafficking throughout this neighborhood.

    ii.  *The weight of the evidence against the person.*

  88. The weight of the evidence against Defendant Gliss also strongly favors detention. Defendant Gliss conducted multiple sales narcotics to informants and undercover officers, and those meetings were recorded using audio and video devices.   The evidence establishing Defendant Gliss's participation in the overall conspiracy is also strong and includes video surveillance of Gliss with other co-defendants at 7th and O Streets while narcotics transactions were being conducted.   Video surveillance footage further establishes Gliss entering and exiting common suspected stash locations used by other co-defendants.   In addition, telephone toll records for Gliss's cellular telephone show multiple contacts with other co-conspirators during the course of the conspiracy, including with at least 8 of the 12 other charged co-defendants in the indictment, as well as multiple other unindicted co-conspirators.

    iii.  *Defendant Gliss's history and characteristics.*

  89. Defendant Gliss's criminal history consists of three drug related convictions, two of which involved drug trafficking.   In addition, the underlying facts of the defendant's 2006 possession of cocaine conviction establish that prior to being stopped and searched by police at 7th and O Streets, NW (the same area that is the subject of the instant indictment), Gliss had distributed narcotics to a CI.   Further, Gliss has 15 prior arrests and has had two bench warrants issued against him for failure to appear.   Despite having received prior sentences of probation, the Gliss has continued to reoffend.

> iv.   *The nature and seriousness of the danger to any person or the community that would be posed by the person's release.*

90.   Defendant Gliss's participation in a long-term and large scale conspiracy to sell crack (and apparently fentanyl) in the District of Columbia demonstrates that he represents a significant danger to the community.   As discussed *supra,* cocaine base and fentanyl are extremely addictive and dangerous controlled substances and the significant quantities the defendant was involved in selling suggest that he has access to significant supplies of narcotics and that he is an experienced drug trafficker.   Further, the investigation has revealed that the defendant is involved in possessing firearms to facilitate his drug trafficking activities, as evidence by his apparent brandishing of a firearm during the February 20, 2022, shooting incident and the recovery of a firearm and high capacity magazine from his residence on May 25, 2022.   The evidence has also established other members of the 7th and O DTO are known to carry firearms and have participated in, or been victims of, shooting incidents.   As discussed *supra,* on May 25, 2022, in addition to the firearm and high capacity magazine, police also recovered additional quantities of crack and fentanyl from the defendant's residence at the time of his arrest.

91.   Accordingly, based upon the overwhelming evidence establishing Defendant Gliss's extensive involvement in this drug conspiracy, the government submits that the defendant cannot rebut the presumption of dangerousness, and therefore, he should be detained pending trial in this matter.   The government also submits that the defendant represents a risk of flight, and that no condition of combination of conditions will reasonably assure the safety of the community and his appearance in court.

J.     <u>Manuel Brown, a.k.a., "Black"</u>

92.    Between November 2021 and January of 2022, law enforcement conducted one controlled purchase of crack cocaine totaling approximately .3 grams and one controlled purchase of fentanyl totaling .8 grams.   The investigation has established Brown's participation in the 7th and O crew and his involvement in operating an open air drug market in the areas surrounding 7th and O Streets, NW.   Physical surveillance conducted during the course of this investigation established that Brown was present in the vicinity of 7th and O Streets on a frequent basis selling narcotics with other members of this DTO, including other co-defendants.   For example, on September 2, 2021, co-defendant Ako Handy was surveilled distributing suspected narcotics to an unidentified male (UM) and handing to co-defendant Manuel Brown the U.S. currency provided by the UM to Handy for the drugs.   In the still shot from the video (see below), Brown can be seen wearing a hat accepting the currency from Handy, whose face is temporarily obscured.



On September 7, 2021, Brown was captured on video surveillance with other co-defendants including Shelton and Williams, while narcotics sales were being conducted. The still shot (see below) from the video surveillance shows Brown greeting Shelton.



93.     In addition, on January 31, 2022, immediately prior to selling crack to a CI, Brown was observed meeting with co-defendant Gliss inside of Brown's Dodge Durango.   Brown's residence was also identified as within apartment building 1330 7th Street, NW, which the investigation revealed was a building that other members of the DTO frequented, including co-defendants Narce, Hood, Young and Johnson.   On May 25, 2022, Brown was arrested on the indictment in this case and a search warrant was executed at his residence.   Recovered during the search was approximately six grams of crack.

94.     Defendant Brown's criminal history consists of a conviction for First Degree Murder While Armed and related firearms offenses from 2002.   Brown was released from custody in January of 2020 and is currently on probation.

>           i.      *The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug.*

95.     The nature and circumstances of the offenses charged are extremely serious and involve the sale of quantities of crack cocaine and fentanyl, and therefore, weigh heavily in favor

47

of detention.   As discussed *supra,* drug overdose deaths are at all-time highs in this country and fentanyl and other opioids are the primary drivers of this epidemic.   As part of his participation in the charged conspiracy, Brown was selling crack cocaine and fentanyl to multiple customers. Indeed, at the time of his arrest, police recovered an additional six grams of crack from the defendant's residence.   Accordingly, his conduct is properly characterized as extremely dangerous indicating that he represents a serious threat to the safety of the community.

96.     Similarly, in participating in the operation of an open air drug market in the area of 7th and O Streets, NW, Defendant Brown's conduct and that of his co-conspirators has created an environment that has incited violence, including multiple shooting incidents in the area, as discussed *supra.*   The occurrence of such incidents would no doubt be much less frequent if the defendant and his co-conspirators were not engaged in illicit drug trafficking throughout this neighborhood.

> ii.     *The weight of the evidence against the person.*

97.     The weight of the evidence against Defendant Brown also strongly favors detention.   Defendant Brown conducted multiple sales narcotics to informants and third parties, and some of those meetings were recorded using audio and video devices.   The evidence establishing Defendant Brown's participation in the overall conspiracy is also strong and includes video surveillance of Brown with other co-defendants at 7th and O Streets while narcotics transactions were being conducted.   In addition, telephone toll records for Brown's cellular telephone show multiple contacts with other co-conspirators during the course of the conspiracy, including with at least 8 of the 12 other charged co-defendants in the indictment, as well as multiple other unindicted co-conspirators.

        *iii.*     *Defendant Brown's history and characteristics.*

98.    As discussed *supra,* Defendant Brown has a conviction from 2002 for First Degree Murder  While Armed and related firearms offenses for which he is currently on probation. Brown was sentenced to 30 years to life, execution of sentence suspended as to all but 20 years. Brown was released from custody in January of 2020, and within at least approximately 18 months, began engaging in illegal drug activities.   Given the severity of Defendant Brown's prior criminal history and his apparent quick return to criminal behavior, this Court should have no confidence that he will comply with court ordered release conditions.

        *iv.*     *The nature and seriousness of the danger to any person or the community that would be posed by the person's release.*

99.    Defendant Brown's participation in a long-term and large scale conspiracy to sell crack and fentanyl in the District of Columbia demonstrates that he represents a significant danger to the community.   The evidence has also established other members of the 7th and O DTO are known to carry firearms and have participated in, or been victims of, shooting incidents.   As discussed *supra,* on May 25, 2022, police recovered an additional quantity of crack from the defendant's residence at the time of his arrest.   Defendant Brown's danger to the community is not only demonstrated by his participation in the charged narcotics trafficking conspiracy, but also by the fact that at the time he committed the instant offense, he was on probation for murder.

100.    Accordingly, based upon the overwhelming evidence establishing Defendant Brown's involvement in this drug conspiracy, and his history and characteristics, the government submits that the defendant cannot rebut the presumption of dangerousness, and therefore, he should be detained pending trial in this matter.   The government also submits that because the defendant presumably faces a significant amount of back-up time for his murder conviction should he be

found guilty of violating probation, the defendant represents a risk of flight, and that no condition of combination of conditions will reasonably assure the safety of the community and his appearance in court.

     K.     Thomas Shelton, a.k.a., "T"

     101.     Between October of 2021 and February of 2022, law enforcement conducted two controlled narcotics purchases from Defendant Shelton totaling approximately 1.6 grams of cocaine base.   The investigation has established Shelton's participation in the 7th and O crew and his involvement in operating an open air drug market in the areas surrounding 7th and O Streets, NW.   Physical surveillance conducted during the course of this investigation established that Shelton was present in the vicinity of 7th and O Streets on a near daily basis selling narcotics with other members of this DTO, including other co-defendants.   Shelton has also been involved in two separate shooting incidents in the area of 7th and O Streets, NW.   The first occurred on February 20, 2022, as discussed in paragraphs 4-8, *supra*.   During that incident, CCTV footage captured Shelton appearing to brandish a firearm and fleeing the scene with co-defendant Gliss and another associate.

     102.     The second shooting incident occurred on March 8, 2022.   On that date at approximately 7:17 p.m., MPD officers heard sounds of multiple gunshots in the area of 7th and N Streets, NW, Washington, D.C. ShotSpotter also detected the sound of eight (8) gun shots in the rear parking lot of 1330 7th Street, NW. Officers responded and canvassed the area for possible victims and a crime scene. During the canvass, eight (8) shell casings bearing head stamp GFL 9mm luger and four (4) shell casings bearing head stamp X-TREME 9mm were discovered in the rear of 1301 and 1307 7th Streets, NW. Additionally, five (5) shell casings bearing head stamp

GFL 9mm luger were discovered in the 600 block of N St., NW. Officers interviewed Witness-1 ("W-1"), a Special Police Officer (SPO) assigned to 1301 7th St., NW. W-1 advised that an unknown witness reported to IT that a black male was observed running in the rear parking lot 1301 7th St., NW. W-1 further advised that the individual was observed placing a firearm underneath a dumpster before fleeing eastbound in the 600 block of O St., NW. Officers canvassed the rear parking lot and located a firearm underneath the dumpster. Additionally, an Apple cellphone with cracked screen and backing was also located in the parking lot in the flightpath of the suspect. The firearm was recovered by the Department of Forensic Sciences (DFS) and found to be a black Glock 17 bearing serial number YLP740. The firearm was loaded with one (1) 9mm round in the chamber (bearing head stamp GFL 9mm luger), as well as an additional seven (7) 9mm rounds. The firearm also was equipped with a high-capacity ammunition feeding device capable of holding seventeen (17) rounds. The Apple iPhone was also seized as evidence. During the processing of the iPhone, a latent fingerprint was lifted. At the time of this writing, results from this latent lift have not been returned.

103.    Police reviewed the camera footage from 1301 7th St., NW, which showed a group of individuals walking southbound through the parking lot. Shortly after, the suspect is observed walking behind the group. The suspect walks into a grassy area and stops. The suspect is observed raising his arm holding what appears to be a firearm and then muzzle flashes are observed. The suspect then runs northbound. Directly after observing the muzzle flashes, multiple individuals are observed running. The suspect is observed running out of the view of the camera for a brief moment, and then returns to a different camera frame as he heads towards the dumpster behind 1301 7th St., NW. The suspect begins looking in the direction of where a marked police vehicle

with activated emergency lights has driven into the block. The suspect briefly walks out of view again and then returns to the dumpster. The suspect is observed bending down and apparently placing an item under the dumpster (the same location where the firearm was recovered). The suspect then walks in a northbound direction where he jumps over a fence, making good his escape.

104.    The suspect is wearing a green in color jacket with fur on the hood that appears to be made by "North Face," red pants, a ski mask (which he had not been wearing in other surveillance from around the time period), and black shoes:



Upon observing the surveillance videos described above, law enforcement officers recognized the suspect to be Defendant Shelton. Further, MPD Investigator Kwamena Yarney spoke about the incident with W-1, who advised that IT had observed the surveillance footage and could also identify the shooter. W-1 stated that the suspect had been barred from the property previously when the suspect provided the name "Malik Wright."   W-1 indicated that IT believed the name

provided was a false name. W-1 provided the barring notice (which shows a date of March 4, 2021), along with a photograph of "Malik Wright." Upon viewing the photograph provided, Investigator Yarney recognized the individual to be Shelton.

105.    The suspect is also observed on surveillance footage walking among a group of people on March 8, 2022 after the shooting:

 

MPD Officer Marwan Abouzied reviewed surveillance footage on scene and apparently observed the suspect without his jacket and in a lighter hoodie after the shooting. W-1 stated that the suspect probably took off his jacket and gave it to someone, and both W-1 and Abouzied agreed that the suspect appeared to give his jacket to a person on the footage. Officers recovered surveillance footage from earlier in the day in the area of 7th and O Streets, NW, which shows a person

identified by law enforcement as Shelton wearing the same clothes as the suspect from the shooting:



106.     A review of the prospective location and historical location data of the cellular phone operated by Shelton (202-763-0109), which was obtained pursuant to a judicially authorized warrant, revealed that Shelton's cellphone pinged at 1202 6th St., NW at 9:08 p.m., with a ping uncertainty of 330 meters. At 9:23 p.m., the cellular phone pinged at 1320 8th St., NW, with a ping uncertainty of 9,545 meters. Both 1202 6th Street, NW and 1320 8th Street, NW are near where the shooting occurred and where the firearm and the iPhone were located.  At 9:38 p.m., the cellular phone failed to locate (i.e., did not ping). The recovered iPhone was also found to contain a SIM card bearing identification number 8901260304718422134. Law enforcement was provided subscriber information from T-Mobile for the telephone number being operated by Shelton (202-763-0109), which revealed that the SIM identification number associated with that cellular phone matched the number on the SIM card recovered from the aforementioned iPhone. The government

submits that there is significant evidence establishing that Defendant Shelton was a participant in this shooting incident.

107.    On May 25, 2022, police executed a search warrant at Shelton's residence and placed him under arrest pursuant to the arrest warrant issued in this case.   The search of Shelton's residence resulted in the recovery of approximately four grams of suspected fentanyl.

108.    Defendant Shelton's criminal history consists of two convictions for Possession of Cocaine from 2019 and Attempted Possession of Liquid PCP from 2018.   Shelton was also on release for a pending misdemeanor charge in DC Superior Court for Attempted Threats to Do Bodily Harm.

> i.      *The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug.*

109.    The nature and circumstances of the offenses charged are extremely serious and involve the sale of quantities of crack cocaine, and therefore, weigh heavily in favor of detention. As discussed *supra,* drug overdose deaths are at all-time highs in this country and fentanyl and other opioids are the primary drivers of this epidemic.   As part of his participation in the charged conspiracy, Defendant Shelton was selling quantities of crack cocaine (and apparently fentanyl). Indeed, at the time of his arrest, police recovered approximately 4 grams of grams of fentanyl from Shelton's residence. Accordingly, his conduct is properly characterized as extremely dangerous indicating that he represents a serious threat to the safety of the community.

110.    Similarly, in participating in the operation of an open air drug market in the area of 7th and O Streets, NW, Defendant Shelton's conduct and that of his co-conspirators has created an environment that has incited violence, including the shooting on February 20, 2022 during which Shelton brandished a firearm, and the March 8, 2022, shooting in which Shelton fired off multiple

rounds, as discussed *supra*.   The occurrence of such incidents would no doubt be much less frequent if the defendant and his co-conspirators were not engaged in illicit drug trafficking throughout this neighborhood.

> ii.     *The weight of the evidence against the person.*

111.    The weight of the evidence against Defendant Shelton also strongly favors detention.   Defendant Shelton conducted multiple sales of narcotics to informants and undercover officers, and those meetings were recorded using audio and video devices.   The evidence establishing Defendant Shelton's participation in the overall conspiracy is also strong and includes video surveillance of Shelton with other co-defendants at 7th and O Streets while narcotics transactions were being conducted.   In addition, telephone toll records for Shelton's cellular telephone show multiple contacts with other co-conspirators during the course of the conspiracy, including with at least 5 of the 12 other charged co-defendants in the indictment, as well as multiple other unindicted co-conspirators.

> iii.    *Defendant Shelton's history and characteristics.*

112.    As discussed *supra,* Defendant Shelton has two drug related convictions from 2019 for Possession of Cocaine and from 2018 for Attempted Possession of liquid PCP.   In both of these matter, the defendant's probation was revoked.   Furthermore, the defendant committed the instant offense while on release for a misdemeanor Attempted Threats charge in DC Superior Court.   Given the defendant's prior history of revocations while under court supervision, and his rearrest while on pretrial release, this Court should have no confidence that he will comply with court ordered release conditions.

> iv.   *The nature and seriousness of the danger to any person or the community that would be posed by the person's release.*

113.   Defendant Shelton's participation in a long-term and large scale conspiracy to sell crack (and apparently fentanyl) in the District of Columbia demonstrates that he represents a significant danger to the community.   As discussed *supra,* cocaine base and fentanyl are extremely addictive and dangerous controlled substances.   Further, the investigation has revealed that the defendant is involved in possessing firearms to facilitate his drug trafficking activities, as evidence by his involvement in two shooting incidents on February 20 and March 8, 2022. The evidence has also established other members of the 7th and O DTO are known to carry firearms and have participated in, or been victims of, shooting incidents.   As discussed *supra,* on May 25, 2022, police also recovered additional quantities of fentanyl from the defendant's residence at the time of his arrest.

114.   Accordingly, based upon the overwhelming evidence establishing Defendant Shelton's involvement in this drug conspiracy, including his participation in acts of violence, the government submits that the defendant cannot rebut the presumption of dangerousness, and therefore, he should be detained pending trial in this matter.

## **CONCLUSION**

The Government will make further argument at the individual detention hearings.   This Court should order that the defendants be held without bond during the pendency of this case to assure their appearance and to protect the safety of others and the community from these defendants who endanger lives by the continuous and constant distribution of dangerous drugs, including fentanyl and cocaine base.

**WHEREFORE**, we respectfully request that the Court issue an Order granting these

Applications.


                              MATTHEW M. GRAVES
                              UNITED STATES ATTORNEY
                              D.C. Bar # 481052

                    By:
                              /s/*Steven Wasserman*
                              Steven B. Wasserman
                              steve.wasserman@usdoj.gov
                              D.C. Bar No. 453251
                              Solomon Eppel
                              seppel@usdoj.gov
                              D.C. Bar No. 1046323
                              Assistant United States Attorneys
                              Violence Reduction and Trafficking Offenses Unit
                              601 D Street N.W, 5th Floor
                              Washington, D.C. 20530
                              (202) 252-7719 (Wasserman)
                              (202) 252-6661 (Eppel)


<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I caused a copy of this pleading to be served upon defense counsel via the electronic case filing system this 27th day of May 2022.


                              /s/*Steven Wasserman*
                              STEVEN B. WASSERMAN
                              Assistant United States Attorney